# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| James M. Croft and Daniel E. Croft, Trustees of the Croft Irrevocable Trust, real party in interest, on behalf of the trust,<br><br>Plaintiffs,<br><br>vs.<br><br>AXA Equitable Life Insurance Company,<br><br>Defendant. | Case No.: 17 Civ.9355 (JMF)<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT** |

Plaintiffs James M. Croft and Daniel E. Croft, on behalf of the Croft Irrevocable Trust, for their Complaint against Defendant AXA Equitable Life Insurance Company ("AXA"), state as follows:

1.      This is an action brought on behalf of Plaintiffs, James M. Croft and Daniel E. Croft, Trustees of the Croft Irrevocable Trust, ("the Trust").

2.      That the original purchaser and insured was Mr. James E. Croft ("Mr. Croft") who received information and marketing of the policy while in Arizona and purchased the policy while in Arizona, and who has a residence in Arizona.

3.      That the Trust was created by Mr. Croft and designates James M. Croft and Daniel E. Croft as Trustees of the Trust.

4.     That AXA is a corporation organized and existing under the laws of New York, having its corporate headquarters in New York, New York. The policy lists AXA's home office at 1290 Avenue of the Americas, New York, New York.

5.     Defendant AXA Athena Universal Life II has inequitably increased the cost of insurance ("COI") in violation of the plan terms of Plaintiffs' Athena Universal Life II ("AUL II") insurance policy.

6.     That the AUL II policy at issue is part of an AXA product line called Athena Universal Life II, and feature flexible-premium, universal life ("UL") policies. The key features of UL policies are that they allow policyholders to pay the minimum amount of premiums necessary to keep the policies in force. This feature differs from other kinds of whole life insurance policies that require fixed monthly premium payments.

7.     That in contrast, owners of UL policies, like the Trust, need only pay an amount sufficient to cover the COI charges and certain other specified expenses. This allows UL policyholders to minimize their capital investment in the policies and to generate greater rates of return through investments *other than* the UL insurance product.

8.     That any optional premium amounts the Trust pays (in excess of COI charges and expense components) are applied to a policy's "Policy Account", sometimes known as "policy account value" or "cash value". These excess premiums earn interest.

9.     AXA expressly markets the AUL II policyholders by utilizing "fact cards" touting the features that the Trust is able to "design premium payments according to your budget" and can "choose the amount and frequency of your premium payments".

10.     That the first page of the AXA policy contains a boldface title calling the policy a "Flexible Premium Universal Life Insurance Policy" and describes the policy as a "flexible premium universal life insurance policy", where the policyholder can, within limits, "make premium payments at any time and in any amount".

11.     That although AXA markets the UL policy products specifically to policyholders seeking to minimize their premium payments and keep policy account values as low as possible, AXA has now sought to deprive policyholders who have exercised their option, of their insurance policies or otherwise make policyholders pay exorbitant and extortionate premiums to keep the policy in force.

12.     That AXA imposed drastic COI rate increases on certain AUL II policyholders, improperly targeting a subset of policyholders, like the Trust, whom exercise their contractual rights to keep their accumulated policy account values as low as possible and pay flexible premiums.

13.     That AXA never gave any notice in the insurance policy or otherwise, that would lead a reasonable person to believe that premium or Cost of Insurance increases could require a payment increase in excess of 260% of the previous year's premium.

14.     That AXA withheld such information because it knew or should have known that no reasonable person would purchase a policy where this was disclosed as a possibility.

15.     That upon information and belief, AXA has improperly targeted COI rate increases to a subset of universal life policies, that include the Trust, for their pattern of minimizing premium payments (and keeping policy values as low as possible) – even though the policies expressly permit that premium pattern, and were explicitly marketed

to policyholders on the basis that the policies allowed for minimal premium payments and low policy account values.

16. That AXA has admitted that the COI increases for AUL II policies are targeted at only a subset of policies in the same policy class at issuance.

17. That the Policies in the subset targeted for the drastic COI increase have two main features in common: the policies have issue ages over age 70, and current face values of over $1 million, which includes the Trust.

18. That the COI increases AXA imposed are contrary to the express and implied contractual limitations, exorbitant, unreasonable and pre-textual.

19. That the result of this wrongful program requires that policyholders are required to either allow the policy to lapse after paying years of premiums, or pay extortionate amounts of premium payments to keep the policy in force.

20. That under either scenario, AXA will reap huge profits at the expense of its policyholders, like the Trust.

21. That AXA's SEC Form 10-Q for the period ending September 30, 2015, AXA boasted that COI increase will be larger than the increase it previously had anticipated, resulting in a $46 million increase to its net profit.

22. That AXA's conduct is not permitted by the policy express language.

23. That the policy issued to the Trust permits AXA to adjust the cost of insurance rates periodically, but only based on certain, enumerated factors, such as changes to reasonable assumptions about morality and investment experience.

24.    That the expressly stated factors do not include allowing a premium adjustment if policyholders, like the Trust, decide to make minimal funding premium payments.

25.    That pre-textually, AXA stated that the COI increase is warranted because the affected insureds are dying sooner than AXA anticipated, and its investment experience has been less favorable than expected.

26.    That AXA's pre-textual explanation is belied by the facts. Evidence shows that mortality trends for the affected insureds have *improved substantially* since the time the policies issued.

27.    That further investment experience does not depend on the premium payment patterns of any particular policyholder or subset of policyholders, but rather relates to the performance of AXA's overall investments and is thus a *non-sequitur*.

28.    That further, AXA's pre-textual explanation also is contradicted by its prior admissions in its required filings. AXA cannot credibly justify the enormous rate increase on the grounds that it was "based on" a change to anticipated experience because that experience as AXA has stated is substantially more favorable than AXA is expressing.

29.    That by targeting only a subset of risk class of AUL II policyholders, AXA further violated the terms of the policies. The AUL II policies at issue here require that any change in COI rates "will be on a basis that is ***equitable to all policyholders*** of a given class".

30.    That AXA has admitted that its exorbitant COI increases are directed at only a certain subset of policies of the same class at issuance (those with issue ages above 70 and a current face value above $1 million). The increase is impermissible.

31.     That upon information and belief, this not the first time that AXA has improperly, and in violation of the policy terms, increased COI charges for The Trust and other similar policyholders establishing a pattern and practice of consciously wrongful behavior against its own insureds.

32.     That the Croft Irrevocable Trust, as represented by the Trustees, is the owner of an AUL II life insurance policy (number 156216664), insuring the life of Mr. Croft ("Mr. Croft"). The Policy was issued by AXA in Arizona, on or about August 8, 2006, and currently has a face value of $5 million (the "Policy"). At issuance, Mr. Croft was age 84.

33.     That Mr. Croft was the original purchaser of the AXA policy but later transferred ownership thereof to the Trust.

34.     That each month thereafter, the Trust paid a monthly premium to keep the policy in force.

35.     That the Policy is subject to AXA's COI increase announced by mail June 14, 2017, and that increased the annual premium from $346,936 to $904,073.

36.     That AXA warned the Trust that payment was required or the policy would lapse.

37.     That the Trust offered to pay the monthly payment of the premium based on the previous annual premium of $346,936.

38.     That AXA impliedly and/or expressly refused the premium payment from the Trust because the payment was not for the full amount of the increase.

39.     That the Policy remained in-force with AXA until it lapsed for non-payment on September 11, 2017.

40. That the insured, Mr. Croft passed away on November 30, 2017.

41. That the Trust was forced to allow the policy to lapse rather than pay the extortionate increase in policy premium.

42. That the Trust was forced to allow the insurance policy to lapse after making more than $4 million in premium payments to keep the policy in force.

**JURISDICTION AND VENUE**

43. That this Court has personal jurisdiction over AXA because it has conducted, and continues to conduct, business in Arizona, and because AXA committed acts and omissions complained of herein, including issuing many of the policies giving rise to the complaint in Arizona. AXA has conducted business in the State of Arizona since March 7, 1899, and is a licensed Life & Disability Insurer by the Arizona Department of Insurance. Upon information and belief, AXA has collected billions in premiums in the state of Arizona, including collecting over $162 million in premiums in 2015 alone, the last year for which data was reported.

44. That Venue is proper in this county because the events giving rise to the Trust's causes of action occurred in Arizona.

**FACTUAL BACKGROUND**

45. That the Policy at issue is an individual, flexible-premium, universal life policy, marketed under the product name Athena Universal Life II, and issued by AXA on August 8, 2006. Hallmarks of the Policy at issue include that there are no fixed or minimum premium payments specified in the Policy.

46. That such flexible-premium policies are preferred by some policy owners specifically because they allow the owners to pay the bare minimum required to keep the policy in force (i.e., the policy owners can keep the policies' Policy Account Value

as low as possible) while preserving capital for other investments that may yield higher returns than the interest to be credited on the Policy Account. It is up to the policyholders to decide whether to keep their Policy Account Value as close to zero as possible (by paying only the bare minimum to cover COI and other administrative expenses needed to keep the policy in effect), or to pay more of the premium in order to build the cash amount subject to interest payments in their Policy Account. By contrast, in the case of fixed-premium policies, the insurer has the use of the premiums in excess of the COI charge and can profit on its own investment of those excess premiums.

47. That AXA has explicitly promoted these flexible-premium policies as policies that allow policyholders to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments".

48. That as one would expect, the amount of the COI charge is highly material to universal life policyholders for two key reasons: (1) the COI charge is typically the highest expense that a policyholder pays; and (2) the COI charge is deducted from the Policy Account (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to AXA (this is in contract to the balance of premium payments, which, after the expenses are deducted, are deposited into the Policy Account and credited with interest by AXA).

49. That all AXA policies in the AUL II product line contain the same common language about how the COI rates will be determined:

> We will determine cost of insurance rates from time to time.
> Any change in the cost of insurance rates we use will be as
> described in the "Changes in Policy Cost Factors" provision.

50. That in turn, the "Changes in Policy Cost Factors" provision states:

> Changes in policy cost factors (interest rates we credit, cost of
> insurance deductions and expense changes) **will be on a basis**

> *that is equitable to all policyholders of a given class*, and
> will be determined *based on reasonable assumptions as to
> expenses, mortality, policy and contract claims, taxes,
> investment income, and lapse*… Any change in policy cost
> factors will be determined in accordance with *procedures and
> standards on file, if required, with the insurance supervisory
> official of the jurisdiction in which the policy is delivered*.

(Emphasis added)

51. That the Policy at issue is a contract of adhesion: a form policy, and insureds are not permitted to negotiate different terms.

52. That once AXA accepts the policy premium payments it accepts its fiduciary-like obligation to protect the Trust and to treat the Trust's rights equal to its own.

53. That on or about October 1, 2015, AXA announced that, effective with the first monthly deductions occurring in 2016, it would increase the COI rates for AUL II policies with issue ages of 70 or older and with current face amounts of $1 million and higher. AXA notified the Trust of the future increase by letters dated October 5, 2015.

54. That later, in December 2015, AXA announced that it would defer the effective date for the COI increase until the first monthly deduction processed on or after March 8, 2016.

55. That AXA has provided no justification for the COI increase other than to claim it is based solely on two factors: allegedly less favorable "future mortality and investment experience" over the past few years.

56. That the Wall Street Journal quoted an AXA spokesperson explaining the reason for the increase as: "the company had concluded one of its older life-insurance products wasn't performing as expected because policyholders were dying sooner and investments were earning less than forecast when the policies were sold."

57.     That AXA's SEC Form 10-Q, for the period ending September 30, 2015 stated, "the Company is raising the COI rates for these policies as management expects future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established." And, AXA has distributed a FAQ on the "Athena Universal Life II COI Rate Change", in which the increase is explained as follows: "We expect future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established and because our view of the anticipated experience has changed, this has necessitated a change in COI rates."

58.     That COI increases breach the policy in at least three ways: (1) they are not "based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses"; and (2) they are not "equitable to all policyholders of a given class"; and they were not executed in accordance with the procedures and standards on file with the relevant California, New York, or Arizona Department of Insurance procedures.

59.     That in February 2015, a mere 7 months prior to first announcing its exorbitant COI increases, AXA disclosed to the the State of New York, that it anticipated no experience factors underlying any non-guaranteed elements that were different than previous experience, contrary to its current allegations.

60.     That the Policy at issue lists the only six "reasonable assumptions" that may trigger a COI rate change under the terms of the Policy. The six factors a permitted COI may be "based on" are "expenses, mortality, policy and contract claims, taxes, investment income, and lapses." Any COI rate adjustments must be 'based on' the enumerated factors, and only those factors.

61.    That AXA publicly stated that the 2016 increase was based on only two factors, which are investment experience and mortality.

62.    That Contrary to AXA's claims that the increase is warranted in part because it found that "policyholders were dying sooner" than expected, mortality rates have actually improved steadily each year – i.e., mortality risks have only gotten better over time, as people are living much longer than anticipated when the products were priced and issued.

63.    That the Policy at issue specifically utilized the "1980 Commissioners Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables" (for attained ages 18 and over) ("1980 CSO") as the basis for establishing maximum insurance costs.

64.    That in the intervening years, there have been multiple studies and updates to mortality tables relied upon by the insurance industry.

65.    That the 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries ("SOA") (which performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables). Periodically, the Society will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include:

- 1990-95 Basic Select and Ultimate Mortality Tables

- 2001 Valuation Basic Mortality Table

- 2008 Valuation Basic table ("VBT")

- 2015 Valuation Basic Table

66.     That the 2001, 2008 and 2015 Valuation Basic tables each show *significant mortality improvements* from the 1990-1995 Basic tables, demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently, and that trend continues. AXA itself recognized that in 2014, the SOA finalized new mortality tables and a new mortality improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

67.     That for older aged insureds – like those impacted by the extreme COI increase – the trend of improving mortality is even more pronounced. In particular, the 2008 VBT showed an improvement for older age mortality as compared to prior tables used at the time the AUL II policies were priced. More importantly, the trend in improving mortality for older ages continued with the introduction of the 2014 VBT.

68.     That in the face of improving mortality experience, as reflected in the updated tables, there is simply no negative mortality experience to justify an increase in the COI, let alone the steep increases AXA imposed. Indeed, through early 2015, AXA continued to inform regulators that it had not in fact observed a negative change in its mortality experience, wholly undercutting its pre-textual basis for the increase.

69.     That AXA also claims that the increase was based on a change to its expectations of future "investment experience". Further, "investments were earning less than forecast when the policies were sold." Although, "investment experience" is not a listed factor that may be considered for increasing COI rates, "investment income" is a listed factor.

70.     That AXA aggregates its capital to make investments into various financial instruments and assets, such as bonds and securities. These investments earn "income" that changes depending on how well the assets are performing. Whether

investment income rises or falls, the performance of those investments is entirely unrelated to the funding decisions or premium payment patterns of an individual policyholder or even a subset of policyholders. Therefore, even if AXA's investment income has changed, this factor cannot justify inflicting a COI increase solely **on the subset of AUL II policies** upon which AXA has sought to impose the COI increase (those with higher issue-ages and face-amounts).

71.    That to impose a COI increase due to a change in reasonable investment income assumptions, the increase should, in some way, actually correspond to observed changes in investment income. However, since approximately 2004, in its public reports, there has been no discernable change in the pattern of AXA's investment income, and no correlation between "investment income" and premiums received, that would in any way justify the exorbitant COI increase in 2016.

72.    That there is no dispute that the COI increase specifically targets policyholders who exercised their contractually permissible right to minimally fund their policies. Further that policyholder funding patterns, or Policy Account Value, are not enumerated factors that AXA may consider in adjusting its COI rates.

73.    That further, even if AXA were somehow permitted to consider funding patterns in increasing COI rates, it could not have had any change in its "reasonable assumptions" as to how these policies would be funded. AXA marketed the policies as flexible-premium policies; at issuance, AXA knew these policies would attract owners, such as life settlement investors, who typically minimally fund the policies.

74.    That the policy mandates that "Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis ***that is equitable to all policyholders of a given class***." As a result, a policy change may not unfairly discriminate against certain policyholders within the same class.

75.     That AXA's COI increase is not "equitable to all policyholders of a given class" because it impermissibly singles out and discriminates against a subset of policyholders within a larger risk class.

76.     That it is neither equitable nor permissible to increase premiums on policyholders based on their funding patterns. The policies are expressly marketed and designed as flexible-premium policies that permit policyholders to select whatever funding pattern they choose, provided only that they pay enough to keep the policies in force. It is simply inequitable for AXA to punish policyholders merely for exercising these fundamental contractual rights. More importantly, the policies, which enumerate the only permissible factors to consider in increasing COI rates, do not mention minimal funding or premium payment patterns as permissible factors to consider when increasing the COI.

77.     That there is no actuarial justification for increasing the COI rates on the selected group of policies – those with issue ages 70 and above and current face value amount of $1 million and above. The policy does not permit AXA to use issue-age or face value to determine who gets a COI increase. Rather, of the limited permissible factors, AXA only claims that mortality and investment income are relevant to its decision to increase COI rates. But AXA cannot reasonably expect that the insured on a policy that issued at age 70 with $1,000,000 in face value is likely to die materially sooner than the insured on a policy that issued at age 70 with $900,000 in face value. Nor is it plausible that AXA's reasonable assumptions about future mortality and investment income experience would differ between these two policies. Because insurance companies do not make investment decisions on a policy-by-policy basis, rather, they pool money for investments, the performance of those investments does not depend in any way on the premium payment patterns on any particular policyholder or

subset of policyholders. In other words, issue-age and face-amount, the criteria that AXA used for determining the subset of policies to saddle with an enormous COI increase, do not coincide with any actuarially acceptable reasons for imposing a COI increase on the selected policies. As a result, the increase is not being implemented "on a basis that is equitable to all policyholders" in the relevant Policy.

78.     That AXA has not increased COI rates across the board for other UL policies. Indeed, in its FAQ on the AUL II increase, AXA states that "at this time, we have no plans to raise COIs on any other products, including products we are currently selling."

79.     That the targeted policyholders, like the Trust, are those policyholders who minimally fund their policies as is permissible under the policy contract language.

80.     That the target class of policyholders, like the Trust, are targeted for exorbitant increases because of their funding pattern.

81.     That the policy does not allow increases in premium due to a pattern of minimal funding.

## COUNT ONE: BREACH OF CONTRACT

82.     That the Trust realleges and incorporate herein the all the previous allegations of this Complaint as if fully set forth herein.

83.     That the subject Policy is a binding and enforceable contract.

84.     That under the terms of the policy, specifically, the "Changes in Policy Cost Factors" provision, any changes made to policy cost factors must be made on a "basis that is equitable to all policyholders of a given class" and determined based on the enumerated factors listed therein.

85. That AXA's rate increase has materially breached the Policy in several respects, including but not limited to the following:

    a. AXA breached the Policy by increasing COI rates based on a policy's issue age and face value even through those factors are not included in the permissible and enumerated bases for increasing cost of insurance rates;

    b. AXA breached the policies by increasing the COI rates on bases that do not apply equitably to the class of insureds; and

    c. AXA breached the policies because AXA's COI rate increase was not based on the permissible factors stated in the policies, such as AXA's expectations of future mortality.

86. That the Trust had performed all of their obligations under the Policy, except to the extent that their obligations have been excused by AXA's breach as set forth herein.

87. That as a direct and proximate cause of AXA's material breaches of the Policy, the Trust have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

88. That the Trust is entitled to an award of attorney's fees and costs.

**COUNT TWO: CONSUMER FRAUD A.R.S. §44-1521 et seq.**

89. That the Trust realleges and incorporates herein the allegations of this Complaint as if fully set forth herein.

90. That the subject Policy is "merchandise" as that word is used in the Arizona Consumer Fraud Act.

16

91.     That AXA's marketing documents constitute "advertising" as that word is used in the Arizona Consumer Fraud Act.

92.     That AXA represented and/or advertised the subject Policy in a way that caused Mr. Croft and thereby, the Trust, to reasonably believe that they were purchasing flexible-premium, universal life policy, without fixed or minimum premium payments specified in the Policy to allow  the Trust to pay the bare minimum required to keep the policy in force (i.e., the policy owners can keep the policies' Policy Account Value as low as possible) while preserving capital for other investments that may yield higher returns than the interest to be credited on the Policy Account.

93.     That AXA, at the inception of the roll-out on the AUL II policies, utilized exceptionally low reductions to the mortality tables in order to make its product more competitive on the open market to gain advantage over competitors.

94.     AXA actuaries acknowledged that their mortality tables were unrealistic as early as 2003 and 2004.

95.     That AXA would incorporate these unreasonably low calculations when disclosing to potential insureds COI rates for policies that these potential insureds, like Mr. Croft wished to purchase.

96.     That AXA has explicitly promoted these flexible-premium policies as policies that allow policyholders to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments".

97.     That AXA markets itself as financially strong and one of the world's largest insurance and wealth management companies.

98.     That AXA markets its purpose as: "To help provide financial security for our clients and their families."

17

99. That AXA peddles protection and security.

100. That AXA, through its actions, omissions and limitations, and advertising, led the Mr. Croft and thereby, the Trust, to believe that AXA was offering flexible-premium policies to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments".

101. That the AXA's policy that it advertised and offered, to Mr. Croft and thereby, the Trust accepted and paid for, is not a "flexible-premium" universal life insurance policy to "design premium payments according to your budget".

102. That each year thereafter Mr. Croft and the Trust would receive annual COI projections that would continue this ruse.

103. These projections were misleading because the stated values were not based on actual values.

104. That it was not until 2015 that AXA began to disclose the actual market values of these AUL II policies.

105. That AXA created and offered a numeric summary based upon the previously described erroneous mortality assumptions to Mr. Croft on August 1, 2006, the date of the policy inception where in projected premiums were set at $346,936 through ten years.

106. That this numeric summary was relied on by Mr. Croft when he decided to purchase the policy.

107. That each year thereafter on August 10, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014, both Mr. Croft and the Trust received misleading and false annual reports claiming to disclose the calculated values of the policy and the planned monthly premium for the upcoming year and each year for all those years the planned monthly premium never changed.

108. That these calculations were false and misleading and AXA knew they were false and misleading because they were based on unreasonably reduced mortality rates upon which the pricing was based.

109. That AXA never disclosed to Mr. Croft or the Trust that between 2006 and 2014, AXA's assumptions had already changed.

110. That AXA knew as early as 2006 that it would have to drastically increase the COI values for Croft and the Trust, but never disclosed it until it had duped Mr. Croft and the Trust into 9 years of premiums.

111. That even after AXA had disclosed to the Trust that its COI would increase, it continued to hide the real reason.

112. That no warning or disclosure ever discussed the possibility of a 260% increase in premium from one year to the next.

113. That upon information and belief AXA knew that a large COI increase would be necessary as early as 2006, when Mr. Croft was deciding to purchase the policy.

114. That AXA failed to disclose these facts to Mr. Croft at the time he decided to purchase the policy.

115. That all conditions precedent to paying flexible-premium insurance benefits have been met by the Trust.

116. That AXA caused insureds such as Mr. Croft and thereby, the Trust, to believe that they had purchased flexible-premium universal life insurance coverage and is liable.

117. That AXA made material affirmative misrepresentations and/or omissions that were reasonably relied on by Mr. Croft and thereby, the Trust, to their detriment, and caused them to purchase insurance that met neither their needs nor their requests,

and was not the flexible-premium universal life insurance coverage that the Trust wanted, requested and thought they were buying.

118.    That Mr. Croft, and thereby the Trust, relied on the material misrepresentations and omissions that induced them to purchase the policy to their ultimate detriment.

119.    That as a direct and proximate result of the conduct as alleged, the Trust has been injured and damaged by being forced to allow the policy to lapse rather than pay the extortionate fees.

120.    That the conduct of the Defendant, in leading Mr. Croft and thereby, the Trust to believe that they were purchasing flexible-premium universal life insurance, violated the Arizona Consumer Fraud Act.

121.    That because these actors acted with a conscious disregard for the likelihood that harm would result, the Trust is entitled to an award of punitive damages.

## COUNT THREE:  BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

122.    That the Trust realleges and incorporates herein the allegations of this Complaint as if fully set forth herein.

123.    That in every contract there is the implied duty of good faith and fair dealing.

124.    That the AXA insurance policy is a contract.

125.    That AXA markets itself as financially strong and one of the world's largest insurance and wealth management companies.

126.    That AXA markets its purpose as: "To help provide financial security for our clients and their families."

127.    That AXA peddles protection and security.

128.    That the implied duty of good faith and fair dealing requires AXA to treat the Trust with equal consideration to itself.

129.    That the implied duty of good faith and fair dealing requires that AXA refrain from doing anything that destroys or jeopardizes the protection and security that it markets and sells.

130.    That AXA, in issuing the insurance policy, expressly promises to increase the cost of insurance if only one or more of the six express conditions occurs.

131.    That AXA as the party with superior bargaining power holds a fiduciary-like obligation to refrain from acting in a manner that would jeopardize the protection that the Trust purchased when it paid premiums to keep the insurance policy in force.

132.    That AXA made a conscious decision to raise the Trust's annual premium payment from $346,936 to $904,073.

133.    That AXA made a conscious decision to target policies like the owned by the Trust, without any reasonable basis.

134.    That AXA knew as early as 2006 that it would increase the COI but withheld this knowledge from Mr. Croft and the Trust.

135.    That AXA knew as early as 2006 that the assumptions it relied on to market the policy were erroneous because they were steeply discounted to make the product more appealing.

136.    That AXA's decision to raise the premium was not based on one of the six reasonable assumptions listed in the policy.

137.    That even if AXA's decision was based on one of the six reasonable assumptions listed in the policy, that its decision as to the amount of increase was not based in reason, but merely to increase its profits at the expense of its insureds.

138.    That AXA's decision was a conscious decision, not motivated by the equal consideration required of it, but by self-interest as evidenced by its SEC 10 Q filing of 2015.

139.    That no reasonable insurance company, understanding of its duty of good faith and fair dealing would have forced the Trust to pay unreasonable increases in premium for reasons outside those expressed in the policy.

140.    That there was no reasonable basis to withhold the actual policy values from Mr. Croft and the Trust from 2006 through 2015.

141.    That there is no reasonable basis for the exorbitant increase in the "Cost of Insurance" and the corresponding premium increase.

142.    That but for the actions of AXA in causing an unwarranted and/or unallowable increase in the premium payment, the Trust would have still owned an in-force insurance policy with a death benefit of $5 million on November 30, 2017, when the insured passed away.

143.    That AXA used its superior bargaining power and superior knowledge to its own advantage and to the disadvantage of the Trust, whom it had promised to protect through the insurance policy.

144.    That before AXA made the decision to raise the premiums such an exorbitant amount, it knew and/or should have known that its actions would either force its insureds to pay un-bargained for premium rates or otherwise cause its insureds, like the Trust, to lose the value of the policy by forcing the policy to lapse.

145.    That AXA knew or was reckless of the fact that it would force its insureds into a "Hobson's Choice," neither of which was good and both which would ultimately cause damage/injury to the Trust and other insureds.

146.    That by forcing this "Hobson's Choice" on the Trust, AXA knew or was reckless of the knowledge that it would destroy and/or jeopardize the protection and

security that it peddles and that Mr. Croft and thereby the Trust purchased or thought they had purchased.

147.    That AXA has acted with a conscious disregard for the likelihood that the Trust would be harmed by its intentional conduct when it made the unilateral decision to raise the insurance premiums to prohibitively high rates under the guise of changes in mortality and investment, when neither was true.

148.    That AXA knew or had reason to know that many of its insureds would not pay the prohibitively high increased premiums and allow their policies to lapse.

149.    That AXA knew or had reason to know that it would receive a financial benefit with every policy lapse.

150.    That AXA knew or was recklessly indifferent to the fact that the Trust would be damaged financially by the policy lapsing.

151.    That AXA breached its implied obligation to the Trust because it knew that its decision was not based on the six reasonable assumptions listed in the contract when it made the decision to almost triple the Trust's premium payment.

152.    That, accordingly, an award of punitive damages in an amount to be proven at trial is appropriate.

WHEREFORE, The Trust prays for judgment against AXA and in favor of the Trust as follows:

A.    For an amount of special damages to be determined at trial;

B.    For an amount of general damages to be determined at trial;

C.    For an amount of punitive damages sufficient to punish AXA and to deter future similar conduct and to deter it and other likeminded insurance companies of similar conduct in the future;

1      D.     In the alternative, for the court to enter an order rescinding the contract

D. In the alternative, for the court to enter an order rescinding the contract and require AXA to return all the premiums paid together with interest and attorney's fees.

E. For attorneys' fees incurred;

F. For taxable costs incurred; and

G. For other just and further relief as this Court deems proper on the premises.

DATED: February 9, 2018.

SURRANO LAW OFFICES

By: /s/ John N. Wilborn
Charles J. Surrano, III
John N. Wilborn
7114 E. Stetson Dr., Suite 300
Scottsdale, Arizona 85251
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2018, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Brian A. Cabianca
Gregory Schneider
Brian.cabianca@squirepb.com
Gregory.schneider@squirepb.com
Squire Patton Boggs (US) LLP
One East Washington Street, Suite 2700
Phoenix, Arizona 85004


David R. Gelfand
Stacey J. Rappaport
Daniel R. Walfish
dgelfand@milbank.com
srappaport@milbank.com
dwalfish@milbank.com
Milbank, Tweed, Hadley & McCloy, LLP
28 Liberty Street
New York, New York 10005

Attorneys for Defendant

s/ Jennie Leetham