**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAMES M. CROFT and DANIEL E. CROFT,
as Trustees of the Croft Irrevocable Trust,

Plaintiffs,

v.

AXA EQUITABLE LIFE INSURANCE
COMPANY,

Defendant.

No. 17 Civ. 9355 (JMF)

[rel. 16 Civ. 740]

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION FOR PARTIAL DISMISSAL**

David R. Gelfand
Stacey J. Rappaport
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
(212) 530-5000

*Attorneys for Defendant AXA Equitable Life*
*Insurance Company*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................... 4

ARGUMENT ........................................................................................................ 7

I.   THE ACFA CLAIM IS TIME-BARRED, AND THE FAC FAILS TO PLEAD
     FRAUD ........................................................................................................ 7

     A.   The ACFA Claim Is Time-Barred ........................................................ 8

     B.   Plaintiffs Do Not Plausibly Allege the Elements of an ACFA Claim ........... 10

          1.   Plaintiffs Identify No False or Misleading Statement ................... 11

          2.   Plaintiffs Do Not Plausibly Allege AXA's Intent Not To Perform ....... 15

          3.   Plaintiffs Fail to Plead Actual Reliance ..................................... 17

II.  THE FAC FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED
     COVENANT OF GOOD FAITH AND FAIR DEALING ................................... 19

     A.   The Contractual Implied Covenant Claim Impermissibly Duplicates
          Plaintiffs' Express Breach Claim ......................................................... 19

     B.   The "Bad Faith" Tort Claim Is Unavailable Here and Is Also Time-Barred ....... 20

III. RESCISSION WOULD BE INEQUITABLE, AND PLAINTIFFS WAIVED
     THEIR RIGHT TO SEEK IT .......................................................................... 22

IV.  THE FAC FAILS TO STATE A CLAIM FOR BREACH OF THE
     "PROCEDURES AND STANDARDS" PROVISION OF THE POLICY ............... 24

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmed v. Collins*,
   23 Ariz. App. 54 (1975) ........................................................................................15

*Alaface v. Nat'l Inv. Co.*,
   181 Ariz. 586 (Ct. App. 1994) ........................................................................8, 9, 10

*In re American Southwest Mortg. Litig.*,
   1990 WL 304214 (D. Ariz. July 12, 1990) ............................................................15

*In re Arizona Theranos, Inc., Litig.*,
   256 F. Supp. 3d 1009 (D. Ariz. 2017) ...............................................................10, 16

*Auto. Holdings, L.L.C. v. Phoenix Corners Portfolio, L.L.C.*,
   2010 WL 1781007 (D. Ariz. May 4, 2010) .............................................................23

*Beaudry v. Ins. Co. of the W.*,
   203 Ariz. 86 (Ct. App. 2002) ..................................................................................21

*Berdeaux v. U.S. Dep't of Educ. Loan Discharge Unit, San Francisco CA*,
   2011 WL 3876001 (D. Ariz. Sept. 2, 2011)............................................................24

*Beshears v. Provident Life & Acc. Ins. Co.*,
   2007 WL 1438738 (D. Ariz. May 15, 2007) ...............................................10, 14, 18

*Biro v. Conde Nast*,
   807 F.3d 541 (2d Cir. 2015)......................................................................................7

*Bollenback v. Cont'l Cas. Co.*,
   243 Or. 498 (1966)...................................................................................................23

*Brooks v. AIG SunAmerica Life Assurance Co.*,
   480 F.3d 579 (1st Cir. 2007)....................................................................................25

*Cates Constr., Inc. v. Talbot Partners*,
   21 Cal. 4th 28 (1999) ...............................................................................................21

*Cervantes v. Countrywide Homes Loans, Inc.*,
   656 F.3d 1034 (9th Cir. 2011) ...................................................................................8

*Cestro ex rel. Cestro v. LNV Corp.*,
   2011 WL 3292574 (D. Ariz. Aug. 1, 2011)............................................................22

*Correa v. Pecos Valley Dev. Corp.*,
  126 Ariz. 601 (Ct. App. 1980) ........................................................................16

*Davis v. Bank of Am. Corp.*,
  2012 WL 3637903 (D. Ariz. Aug. 23, 2012) ..................................................14

*DeLoach v. Alfred*,
  192 Ariz. 28 (1998) ..........................................................................................20

*DuBeck v. Cal. Physicians' Serv.*,
  234 Cal. App. 4th 1254 (2015) ........................................................................23

*Elias v. Rolling Stone LLC*,
  872 F.3d 97 (2d Cir. 2017) .................................................................................7

*Ellul v. Congregation of Christian Bros.*,
  774 F.3d 791 (2d Cir. 2014) .............................................................................10

*Filasky v. Preferred Risk Mut. Ins. Co.*,
  152 Ariz. 591 (1987) ........................................................................................21

*Food Pro Int'l, Inc. v. Farmers Ins. Exch.*,
  169 Cal. App. 4th 976 (2008) ..........................................................................21

*Freedberg v. Ohio Nat'l Ins. Co.*,
  975 N.E.2d 1189 (Ill. Ct. App. 2012) ..............................................................23

*Gaidon v. Guardian Life Ins. Co. of Am.*,
  94 N.Y.2d 330 (1999) ......................................................................................15

*Gill v. Rich*,
  128 Cal. App. 4th 1254 (2005) ........................................................................22

*Goldstein v. Quantum Health Res., Inc.*,
  1996 WL 813245 (C.D. Cal. Dec. 23, 1996) ...................................................12

*Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*,
  182 Ariz. 586 (1995) ....................................................................................8, 21

*Hunter Contracting Co. v. Sanner Contracting Co.*,
  16 Ariz. App. 239 (1972) .................................................................................19

*Irwin v. Dep't of Veterans Affairs*,
  498 U.S. 89 (1990) ...........................................................................................10

*Jackson v. Chandler*,
  204 Ariz. 135 (2003) ........................................................................................20

*Jennings v. Lee*,
　105 Ariz. 167 (1969) ...........................................................................................22

*Johnson v. Nextel Commc'ns Inc.*,
　780 F.3d 128 (2d Cir. 2015) ................................................................................20

*Kuehn v. Stanley*,
　208 Ariz. 124 (Ct. App. 2004) .............................................................10, 13, 17, 18

*Lenart v. Coach Inc.*,
　131 F. Supp. 3d 61 (S.D.N.Y. 2015) ...................................................................17

*Lerner v. Fleet Bank, N.A.*,
　459 F.3d 273 (2d Cir. 2006) ................................................................................17

*Maloney v. Scottsdale Ins. Co.*,
　256 F. App'x 29 (9th Cir. 2007) ..........................................................................17

*Manterola v. Farmers Ins. Exch.*,
　200 Ariz. 572 (Ct. App. 2001) ............................................................................21

*Maricopa Cty. v. Office Depot Inc.*,
　2014 WL 12672679 (D. Ariz. Dec. 15, 2014) ....................................................14

*Nickolas v. Structured Asset Mortg. Inv. II Trust 2006-AR8*,
　2014 WL 11515615 (D. Ariz. Feb. 10, 2014) ......................................................8

*Prieto v. Paul Revere Life Ins. Co.*,
　354 F.3d 1005 (9th Cir. 2004) .............................................................................21

*Rawlings v. Apodaca*,
　151 Ariz. 149 (1986) ...........................................................................................19

*In re Real Estate Assocs. Ltd. P'ship Litig.*,
　223 F. Supp. 2d 1109 (C.D. Cal. 2002) ..............................................................22

*Rich v. BAC Home Loans Servicing LP*,
　2014 WL 7671615 (D. Ariz. Oct. 9, 2014) .........................................................14

*Seltzer v. Paul Revere Life Ins. Co.*,
　2010 WL 11523741 (D. Ariz. Dec. 10, 2010) ....................................................20

*Shields v. Citytrust Bancorp, Inc.*,
　25 F.3d 1124 (2d Cir. 1994) ................................................................................10

*Smith v. Hurley*,
　121 Ariz. 164 (Ct. App. 1978) ............................................................................23

*U.S. ex rel. Smith v. New York Presbyterian Hosp.*,
2007 WL 2142312 (S.D.N.Y. July 18, 2007) .......................................................................25

*Sullivan v. Pulte Home Corp.*,
231 Ariz. 53 (Ct. App. 2012) ...............................................................................................18

*Taylor v. State Farm Mut. Auto. Ins. Co.*,
185 Ariz. 174 (1996) ............................................................................................................20

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)............................................................................................4, 12

*Toulon v. Cont'l Cas. Co.*,
2015 WL 4932255 (N.D. Ill. Aug. 18, 2015) .....................................................................15

*Van Den Heuvel v. AI Credit Corp.*,
951 F. Supp. 2d 1064 (E.D. Wis. 2013)..............................................................................14

*Van Dusen v. Barrack*,
376 U.S. 612 (1964) .............................................................................................................20

*Von Hoffmann v. Prudential Ins. Co. of Am.*,
202 F. Supp. 2d 252 (S.D.N.Y. 2002)..................................................................................15

*In re Vortex Fishing Sys., Inc.*,
277 F.3d 1057 (9th Cir. 2002) .............................................................................................20

## Statutes

A.R.S. § 44-1522(A)........................................................................................................2, 13

Ariz. Rev. Stat. § 12-541(5).....................................................................................................8

v

Defendant AXA Equitable Life Insurance Company ("AXA") respectfully submits this memorandum in support of its motion for partial dismissal of the First Amended Complaint ("FAC") pursuant to Federal Rules of Civil Procedure 8, 9(b) and 12(b)(6). Specifically, AXA seeks dismissal with prejudice of: (1) the Arizona Consumer Fraud Act claim; (2) the claim for breach of the implied covenant of good faith and fair dealing; (3) the prayer for punitive damages and rescission; and (4) the breach of contract theory based on the "procedures and standards on file" clause of the subject policy.[1]

## PRELIMINARY STATEMENT

This is a breach of contract case challenging AXA's increase to the cost of insurance ("COI") rates applicable to certain classes of AXA's Athena Universal Life II ("AUL II") policy line. AXA announced the COI increase ("COI Adjustment") in October 2015 and implemented it in March 2016. Plaintiffs, James M. Croft and Daniel E. Croft, are trustees of the Croft Irrevocable Trust ("Trust"), which owned an AUL II policy (the "Policy") affected by the COI Adjustment. The Policy was issued in 2006 and insured the life of James E. Croft ("Mr. Croft"). In September 2017, Plaintiffs allowed the Policy to lapse, and Mr. Croft died later that year. Mr. Croft's estate is not a party to this litigation. Mr. Croft was the insured person, and originally owned the Policy until he transferred it to the Trust.

As with the three earlier-filed, related actions pending before this Court,[2] Plaintiffs allege

---

[1] AXA has strong defenses with respect to the remaining breach of contract claim (Count One) and fully expects to prevail on those defenses. Mindful of the Court's prior Rule 12(b)(6) rulings, however, AXA is not seeking dismissal of Plaintiffs' breach of contract claim, except to the extent it is based on a theory that the COI Adjustment was "not executed in accordance with the procedures and standards on file[.]" *See* FAC ¶ 58.

[2] *Brach Family Found., Inc. v. AXA Equitable Life Ins. Co.*, 16 Civ. 740 ("*Brach*"); *EFG Bank AG, Cayman Branch, et al. v. AXA Equitable Life Ins. Co.*, 17 Civ. 4767 ("*EFG*"); *The Duffy 2004 LLC, et al. v. AXA Equitable Life Ins. Co.*, 17 Civ. 4803 ("*Duffy*") (collectively, the "Related Actions").

that the COI Adjustment breached the terms of the Policy.  Plaintiffs also allege a claim for breach of the implied covenant of good faith and fair dealing, which is substantively identical to the claims recently dismissed in *EFG* and *Duffy*.  The FAC also includes a claim for consumer fraud under the Arizona Consumer Fraud Act (A.R.S. § 44-1522) ("ACFA"), which has not been asserted in any of the Related Actions.  In addition to other relief, Plaintiffs seek punitive damages and rescission.

The ACFA claim is time-barred by the applicable one-year statute of limitations.  The claim accrued when AXA notified Plaintiffs of the COI Adjustment by letter dated October 5, 2015; Plaintiffs filed this action on October 25, 2017 – more than two years later.  Plaintiffs also fail to plausibly allege any false statement or actionable omission in connection with the marketing or sale of the Policy, AXA's knowledge of alleged falsity, or AXA's intent not to perform its contractual obligations.  The FAC merely alleges that AXA's characterization of the Policy as "flexible premium" life insurance was false, or became so by virtue of the COI Adjustment.  But, as Plaintiffs acknowledge elsewhere in the FAC, the Policy *was* a flexible premium policy, and remained so even after the COI Adjustment.  Plaintiffs' other "fraud" theory is that AXA did not disclose to Mr. Croft the possibility of the COI Adjustment at the time of sale.  The claim is flatly contradicted by the very "marketing documents" (*see* FAC ¶ 91) on which Plaintiffs base their claim, which are replete with warnings that current COI rates are not guaranteed and subject to change at any time up to a contractually specified maximum level.  These repeated disclosures – the receipt and understanding of which Mr. Croft acknowledged in writing – defeat Plaintiffs' claim that they were "duped" (*see* FAC ¶ 110) into buying a Policy that turned out to be more expensive than allegedly advertised.

Plaintiffs' failure to allege that AXA, at the time the statements were made or the information was omitted, acted with knowledge that its "advertising" was false or misleading (*i.e.*, that AXA lacked an intent to perform as promised) also requires dismissal of their ACFA claim.  So too does Plaintiffs' failure to allege any false sale- or advertising-related statement was made to *them* – as distinct from Mr. Croft, the former owner of the Policy – because Plaintiffs thus cannot plausibly allege the Trust relied on any statement by AXA.

Plaintiffs' implied covenant claim should be dismissed because it duplicates their express breach of contract claim.  To the extent Plaintiffs assert an implied covenant claim sounding in tort, it is time-barred, and not otherwise cognizable under California or Arizona law because Plaintiffs have not alleged a wrongful denial of insurance benefits or other misconduct in the claims handling context.  As in *EFG* and *Duffy*, tort remedies are available for breach of a *contractual* duty only in exceptional cases where the insurer engages in bad faith claims handling, such as refusing to pay benefits after a covered loss occurs.  That is not alleged here. The absence of a viable tort claim also precludes Plaintiffs' request for punitive damages.

Plaintiffs are not entitled to rescission.  Plaintiffs demand as an alternative remedy an order requiring AXA to return all premiums paid under the Policy.  Here, restoring the parties to the *status quo ante* is not possible.  For more than eleven years, the policyholder enjoyed the benefits, and AXA incurred the risk, of $5 million of coverage in the event of Mr. Croft's death. To refund eleven years of premiums would provide a grossly inequitable windfall to Plaintiffs, and strip AXA of any compensation for having borne that risk.  Further, Plaintiffs waived the rescission remedy by waiting two years to assert it.

Finally, Plaintiffs' conclusory "procedures and standards on file" theory of contract breach must be dismissed because it is devoid of any factual content.

3

## BACKGROUND

AXA issued the Policy on the AUL II contract form.  An AUL II policyholder makes an initial premium payment into a Policy Account.[3]  Thereafter, the policyholder chooses when and how much to pay in premiums.  *See* FAC ¶ 46.  If the value of the Policy Account is insufficient to cover the monthly charges, the policy will lapse unless more premium is paid.  *See* Rappaport Decl. Ex. A at 4.  Upon the death of the insured, the insurer pays the beneficiary of the policy the specified death benefit, also known as the face amount of the policy.  *Id.* at 10-11.

The Policy had a face amount of $5 million and insured the life of Mr. Croft.  FAC ¶ 32. AXA issued the Policy on August 8, 2006 when Mr. Croft was 84 years old.  *See id*; Rappaport Decl. Ex. A at 4.  Mr. Croft listed an Arizona residence on his Policy application, Rappaport Decl. Ex. A at 23; *see also* FAC ¶ 2 (Mr. Croft "has a residence in Arizona"), but executed the Policy application and related documents in California.  *See* Rappaport Decl. Ex. A at 26.  Mr. Croft was the original owner of the Policy, *id.* at 4, and after issuance, transferred ownership to the Trust.  FAC ¶ 33.

As Plaintiffs acknowledge, the Policy expressly allowed AXA to set (and reset) COI rates at any level up to a specified maximum.  *See, e.g.*, *id.* ¶ 49.  It also provided that any *change* in COI rates "will be as described in the 'Changes in Policy Cost Factors' provision"[4] (*id.*) and that

---

[3] *See* Declaration of Stacey J. Rappaport ("Rappaport Decl."), dated March 2, 2018, Ex. A (Policy) at 4. The Court may consider the Policy because it is referenced in, and integral to, the FAC.  *See, e.g.*, *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).  Page numbers for exhibits cited herein are based on the ECF header for that exhibit.

[4] The provision states: "Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses.  Any change in policy cost factors will never result in . . . policy charges that exceed the maximum policy charges guaranteed in the policy.  Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered."  *See* Rappaport Decl. Ex. A at 16.

COI rates "*will never be more than* those shown in" the "Table of Maximum Monthly Cost of Insurance Rates Per $1,000 of Net Amount at Risk for the Base Policy[.]"  *See* Rappaport Decl. Ex. A at 14 (emphasis added).  This Table – which has its own page in the Policy – disclosed the maximum COI rates that AXA could impose.  *Id.* at 8.

In late 2015, AXA invoked its contractual rights and announced the COI Adjustment. FAC ¶ 53.  Specifically, "on or about October 1, 2015," AXA announced that it would raise COI rates on AUL II policies for which both (i) issue age is 70 or above, and (ii) current face amount is $1 million or greater.  *Id.*  AXA explained that the COI Adjustment was due to less favorable "future mortality and investment experience" than what was anticipated when the COI rate schedule was established.  *See id.* ¶ 57.  AXA "notified the Trust of the future increase by letter[] dated October 5, 2015" (*id.* ¶ 53), and implemented the increased COI rates on March 8, 2016. *Id.* ¶ 54.  The COI Adjustment is within the contractual limits, and Plaintiffs do not allege otherwise.  In September 2017, the Policy lapsed for non-payment.  *Id.* ¶ 39.

Plaintiffs allege that "AXA expressly markets the AUL II policyholders [*sic*] by utilizing 'fact cards'" stating that a policyholder "is able to 'design premium payments according to your budget' and can 'choose the amount and frequency of your premium payments.'"  *Id.* ¶ 9. Plaintiffs do not allege that the Trust (or Mr. Croft) received or viewed a "fact card," only that Mr. Croft "received information and marketing of the [P]olicy while in Arizona[.]"  *Id.* ¶ 2. AXA's two-page "fact card" for AUL II ("Fact Card")[5] describes "Flexible Premiums" as: "[d]esign premium payments according to your budget," "[c]hoose the amount and frequency of your premium payments *(certain limits apply)*," and "[p]ay premiums annually, semiannually,

---

[5] The Court may consider this and the other documents attached hereto in ruling on AXA's motion for partial dismissal of the FAC because they are referenced in, and integral to, the FAC.  *See supra* note 3.

quarterly, monthly, or through automatic monthly or quarterly deductions from your checking account."  Rappaport Decl. Ex. B at 2 (emphasis added).  It also states in the first paragraph: "This fact card is not a complete description of all material provisions of the policy.  For more complete information, please refer to the actual policy."  *Id.*

Plaintiffs also allege that AXA "created and offered" to Mr. Croft on August 1, 2006, "a numeric summary . . . where in [*sic*] projected premiums were set at $346,936 through ten years."  FAC ¶ 105.  Plaintiffs appear to be referring to the "original illustration" signed by Mr. Croft on August 1, 2006 (one week before AXA issued the Policy) to acknowledge that he received, viewed, and understood the information therein ("Sales Illustration").  *See* Rappaport Decl. Ex. C.  It stated: "cost of insurance charges . . . are not guaranteed and may be changed at any time" (*id.* at 3), and "actual results [*i.e.*, policy values and benefits] could be either higher or lower" than illustrated.  *Id.* at 6; *see also id.* at 4, 7.

Finally, Plaintiffs allege that each year thereafter, "on August 10, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014, both Mr. Croft and the Trust received . . . annual reports claiming to disclose the calculated values of the policy and the planned monthly premium for the upcoming year[.]"  FAC ¶ 107.  Plaintiffs appear to be referring to annual account statements prepared by AXA that summarized account activity for the preceding year and provided Policy Account values as of the end of each reporting period ("Annual Report").  *See* Rappaport Decl. Ex. D (sample report for the Policy for period ending August 10, 2013).  The Annual Report disclosed that "[t]he current [monthly] cost of insurance rates *are not guaranteed and may be changed in accordance with the terms of your policy*."  *Id.* at 3 (emphasis added).  The Annual Report also showed that Plaintiffs' projected Policy Account and Death Benefit values as of August 10, 2014, based on the contractually permitted **maximum COI rates** and Plaintiffs'

planned periodic premiums would be $0.00, warning that "[t]his policy may be in danger of terminating without value in the next 12 months unless additional premium is paid." *Id.* at 5.

AXA moved for dismissal of the ACFA, conversion, and rescission claims in Plaintiffs' initial complaint. ECF No. 28. The Court gave Plaintiffs an opportunity to amend their pleading. ECF No. 31. In their FAC (ECF No. 40), Plaintiffs (a) abandon their conversion and rescission claims (but still request rescission as a remedy); (b) add a claim for breach of the implied covenant of good faith and fair dealing (which seeks punitive damages); (c) amend their ACFA claim to include new "fraudulent omission" theories; and (d) amend their contract claim to allege that the COI Adjustment was not "in accordance" with "procedures and standards on file," FAC ¶ 58. Each of these new claims and theories fails as a matter of law.[6]

## ARGUMENT

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) ("'[C]onclusory statements' are not enough.").

## I.    THE ACFA CLAIM IS TIME-BARRED, AND THE FAC FAILS TO PLEAD FRAUD

Plaintiffs advance two theories of fraud in support of their ACFA claim – one based on alleged misrepresentations in the Fact Card concerning the "flexible premium" features of the

---

[6] AXA assumes for purposes of this motion that either California or Arizona law governs Plaintiffs' implied covenant claims and prayers for punitive damages and rescission (except that Arizona's statutes of limitations governs, *see infra* note 22). Because California and Arizona laws are similar on these issues, Plaintiffs' claims fail regardless of which state's law applies.

Policy (*see* FAC ¶¶ 9, 47, 96, 100, 101) and another based on alleged non-disclosure of "the possibility of a 260% increase in premium from one year to the next" (*id.* ¶ 112; *see also id.* ¶¶ 13, 91).  The claim – brought more than two years after Plaintiffs learned of the COI Adjustment – is on its face barred by the applicable one-year statute of limitations.  The claim also fails because Plaintiffs' fraud theories are not plausible and lack the requisite particularity.  Indeed, both theories are squarely contradicted by the documents on which they purport to rely.

      **A.**      **The ACFA Claim Is Time-Barred**

An "action[] . . . [u]pon a liability created by statute" must "be commenced . . . within one year after the cause of action accrues, and not afterward."  Ariz. Rev. Stat. § 12-541(5).  An ACFA claim is "a liability created by statute," and therefore "must be initiated *within one year after the cause of action accrues*."  *Alaface v. Nat'l Inv. Co.*, 181 Ariz. 586, 591 (Ct. App. 1994) (emphasis added).  The limitations period for an ACFA claim begins running no later than "when the defrauded party discovers or with reasonable diligence could have discovered the fraud."  *Id.*; *see also Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 182 Ariz. 586, 588 (1995) [hereinafter "*Prudential*"] (explaining Arizona's "discovery rule").

Here, Plaintiffs plead that they learned of the COI Adjustment – which supposedly revealed the falsity of alleged representations concerning the "flexible premium" features of the Policy and "disclose[d] the actual market values of these AUL II policies" (FAC ¶ 104) – on or about October 5, 2015.  FAC ¶ 53.  The deadline to bring the ACFA claim expired one year later, in early October 2016.  Plaintiffs filed this action on October 25, 2017 (*see* ECF No. 1), more than two years later.  The ACFA claim is time-barred.  *See, e.g.*, *Cervantes v. Countrywide Homes Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011) (dismissing ACFA claim where "[t]he running of the limitations period[] . . . [was] apparent on the face of the complaint"); *Nickolas v. Structured Asset Mortg. Inv. II Trust 2006-AR8*, 2014 WL 11515615, at *3 (D. Ariz. Feb. 10,

2014) (dismissing ACFA claim because "the allegations in the complaint establish that the violations at issue occurred well over a year before Plaintiff filed this suit").

Plaintiffs attempt to excuse their late filing of the ACFA claim with a single, cryptic allegation in the FAC: "even after AXA had disclosed to the Trust that its COI would increase, it continued to hide the real reason."  FAC ¶ 111.  This allegation cannot excuse Plaintiffs' two-year delay.  First, the FAC does not allege what it is AXA "continued to hide" after it announced the COI Adjustment, and why that concealed information prevented Plaintiffs from timely filing their claim.  According to the FAC, the alleged deceptions on which Plaintiffs base their ACFA claim were (i) that the Policy was "not a 'flexible premium' universal life insurance policy" (*id.* ¶ 101); and (ii) that AXA "duped Mr. Croft and the Trust into *9 years* of premiums" (*id.* ¶ 110 (emphasis added)) by not disclosing "the possibility of a 260% increase in premium from one year to the next" (*id.* ¶ 112; *see also id.* ¶ 13).  This alleged "ruse" (*id.* ¶ 102) would have ended no later than October 5, 2015, when Plaintiffs received notification of the COI Adjustment.  To the extent Plaintiffs allege that "the real reason" (*id.* ¶ 111) for the COI increase was AXA's "self-interest[ed]" desire to increase "its net profit," this "motivat[ion]" was "evidenced by its SEC 10 Q filing of 2015" (for the period ending September 30, 2015), *see id.* ¶¶ 20-21, 138. Even after these disclosures, Plaintiffs waited over two years to bring their claim.

Second, even if Plaintiffs did not discover the alleged "real reason" for the COI rate increase until after October 2015, Arizona law makes clear that Plaintiffs "did not have to know all of the underlying details of the misrepresentation before their [ACFA] cause of action accrued." *Alaface*, 181 Ariz. at 591.  An ACFA claim "accrues when 'the plaintiff knows or should have known of both the *what* and *who* elements of causation.'"  *Id.* (emphasis in original). Here, Plaintiffs had actual knowledge of the "what" element of causation when they learned of

AXA's decision to increase the COI rate applicable to their Policy.  The "who" element was also known to Plaintiffs by October 2015, namely that AXA was the source of the allegedly misleading "marketing documents."  FAC ¶ 91.  In *Alaface*, the court rejected an argument similar to Plaintiffs' here that "[plaintiffs'] consumer fraud claim did not accrue until they began to suspect . . . that the misrepresentations were *knowingly* made."  181 Ariz. at 591 (emphasis added).  The court held that because "the only showing of intent required in a consumer fraud claim [as distinct from a common law fraud claim] is an intent to do the act involved[,]" plaintiffs did not need to acquire knowledge of facts to show a "specific intent to deceive" to bring an ACFA claim.  *Id.*  So too here.  Plaintiffs' ACFA claim is time-barred.[7]

### B.      Plaintiffs Do Not Plausibly Allege the Elements of an ACFA Claim

The elements of a private claim under ACFA are (1) "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise," and (2) "consequent and proximate injury resulting from the promise."  *Kuehn v. Stanley*, 208 Ariz. 124, 129 (Ct. App. 2004).  An omission made "in connection with a sale or advertisement of merchandise" is actionable under ACFA if it is "material" and made "with intent that a consumer rely [upon it]."  *In re Arizona Theranos, Inc., Litig.*, 256 F. Supp. 3d 1009, 1023 (D. Ariz. 2017).  "The particularity requirement of Rule 9(b) applies to ACFA claims."  *Beshears v. Provident Life & Acc. Ins. Co.*, 2007 WL 1438738, at *3 (D. Ariz. May 15, 2007).  Plaintiffs must "(1) specify the statements that [Plaintiffs] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

---

[7] *See Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) ("[A] statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."); *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 91-92 (1990) (same).

### 1.    Plaintiffs Identify No False or Misleading Statement

Plaintiffs fail to plausibly allege the falsity of any promise or representation AXA made in the "marketing documents" (FAC ¶ 91) or other Policy-related materials.  Nor do they allege an actionable omission because the possibility of a COI increase is repeatedly disclosed in the very "marketing documents" on which Plaintiffs base their claim.  This is not merely a failure of particularity; it is a failure to allege, even under Rule 8 standards, the most basic element of any fraud claim – falsity.

Plaintiffs' primary fraud theory is that AXA falsely described the Policy as "flexible premium."  But the Policy, both before and after the COI Adjustment, *was* a flexible-premium policy.  AUL II policyholders always have been free to choose the amount and frequency of their premium payments, with the understanding that, as described in the Policy, if the Policy Account value is insufficient to cover the monthly charges, the policy will lapse.  Plaintiffs do not contend otherwise.  FAC ¶ 76.  For the same reason, the Fact Card's statements that policyholders can "[c]hoose the amount and frequency of [their] premium payments *(certain limits apply)*"[8] (emphasis added) and "[d]esign premium payments according to [their] budget" are entirely true.

Plaintiffs claim that "*no warning or disclosure ever* discussed the possibility of a 260% increase in premium from one year to the next."  FAC ¶ 112 (emphasis added); s*ee also id.* ¶ 13 ("AXA *never gave any notice* in the insurance policy or otherwise, that would lead a reasonable person to believe that premium or Cost of Insurance increase could require a payment increase in excess of 260% of the previous year's premium." (emphasis added)).  The "marketing" and other

---

[8] The FAC consistently omits this crucial italicized language.  Also, the Fact Card clearly stated that it was "not a complete description of all material provisions of the policy[,]" and referred prospective policyholders to the policy itself for "complete information" about its workings.  Rappaport Decl. Ex. B at 2.  The Policy disclosed the possibility of a COI increase and of Policy lapse in the event the Account Value became too low.  *Id.* Ex. A at 4, 16.

documents referenced in the FAC state otherwise.[9]  The Policy included a "Table of Maximum

Monthly Cost of Insurance Rates," which disclosed that the rates applicable to the Policy could

increase – substantially – in the future.  *See* Rappaport Decl. Ex. A at 8.  Indeed, the COI

Adjustment was less than these maximum levels.  The Policy, the Fact Card, the Sales

Illustration, and the Annual Reports all prominently and repeatedly disclosed that COI rates were

not guaranteed and were subject to change at any time up to a specified maximum.[10]  Plaintiffs

cannot base a fraud claim on alleged non-disclosure of information that was actually disclosed.

*Goldstein v. Quantum Health Res., Inc.*, 1996 WL 813245, at *5 (C.D. Cal. Dec. 23, 1996) (as

defendant "actually disclosed the information [p]laintiff claims was omitted," plaintiff's claims

"based on this alleged omission fail").

   Significantly, while Plaintiffs allege that "no reasonable person would purchase a policy

where this [260% premium increase] was disclosed as a possibility" (FAC ¶ 14), Mr. Croft not

only purchased such a policy but, on August 1, 2006, acknowledged (twice) by his signature on

the Sales Illustration the following:

   I have received a copy of all numbered pages of this basic Illustration.  I have
   viewed it and *understand that any non-guaranteed elements*[11] *illustrated are*

---

[9] *See, e.g.*, *Tongue*, 816 F.3d at 206 n.6 ("Where a document is referenced in a complaint, 'the documents control and this Court need not accept as true the allegations'" about the document in the complaint).

[10] *See* Rappaport Decl. Ex. A (Policy) at 4, 8, 16; *id.* Ex. C (Sales Illustration) at 2, 4, 7-8 ("the scale of COI charges can change, subject to a guaranteed maximum[;]" the Policy benefits and values shown "[a]ssum[e] [c]urrent [c]harges" and "are not guaranteed[;]" "[a]ssumptions on which non-guaranteed elements are based are subject to change by the insurer[,]" and "[a]ctual results may be more or less favorable"); *id.* Ex. D (Annual Report) at 5 ("The current monthly cost of insurance for the insured person and additional benefits are not guaranteed and may be changed in accordance with the terms of your policy."); *id.* Ex. B (Fact Card) at 2 (specifically noting that *only* if a policyholder selected the Lapse Protection Rider ("LPR") would AXA "guarantee [his or her] death benefit protection for [his or her] lifetime, regardless of changes in . . . cost of insurance rates").  Mr. Croft did not select the LPR – meaning that AXA specifically did *not* guarantee that the Policy would not lapse if COI rates increased and additional premiums were not paid to cover that increase.

[11] The Sales Illustration defined "Non-Guaranteed Values" to include "cost of insurance charges" that "are not guaranteed and may be changed at any time at the discretion of the Board of Directors." Rappaport Decl. Ex. C at 3.  It then explained the impact of a COI rate increase on the value of the Policy:

> *subject to change*; this Illustration assumes that non-guaranteed elements remain
> unchanged for all years shown, and because *this is not likely to occur*, actual results
> could be either higher or lower.  *The agent has told me they are not guaranteed*."

*See* Rappaport Decl. Ex. C at 6 (emphasis added).

Plaintiffs further allege that each year (starting on August 10, 2007), Mr. Croft and the

Trust received "misleading and false annual reports" (also referred to in the FAC as "annual COI

projections"), "claiming to disclose the calculated values of the policy and the planned monthly

premium for the upcoming year and each year for all those years the planned monthly premium

never changed."[12]  FAC ¶¶ 102-03, 107.  As a threshold matter, the Annual Reports cannot

undergird Plaintiffs' ACFA claim because they were *not* provided "in connection with the sale or

advertisement" of the Policy, as the statute requires (*see Kuehn*, 208 Ariz. at 129; A.R.S. § 44-

1522(A)), but rather *after* Mr. Croft had already purchased the Policy in August 2006.[13]

---

"If future declared . . . [COI] charges are higher than AXA Equitable's non-guaranteed illustrated . . .
charges, *there may be insufficient policy values to provide the projected non-guaranteed policy values
that are shown in this illustration*."  *Id.* (emphasis added).  Mr. Croft was also notified that under a
"Guaranteed Values" scenario, "[b]ased on the assumptions of this illustration, the policy terminates
without value."  *Id.* at 9.  "Guaranteed Values" were defined to include "guaranteed maximum cost of
Insurance charges[.]"  *Id.* at 3.

[12] The Annual Reports showed Plaintiffs' monthly "Planned Periodic Premium" of $28,911.33 "paid
during the policy year," *not* "for the upcoming year," as the FAC incorrectly alleges.  *Cf.*, FAC ¶ 107; *see*
Rappaport Decl. Ex. D at 3-4.  These premium amounts were determined initially by Mr. Croft and then
by the Trust, *not* by AXA.  "Planned Periodic Premium" is defined in the Sales Illustration as: "[t]he
amount *the policy owner plans to pay* each modal period as specified on the life insurance application.  It
is the amount which will be drafted or billed based on the frequency *selected [by the policy owner]*."  *Id.*
Ex. C at 3 (emphasis added).  Plaintiffs acknowledge as much (*see* FAC ¶ 76) and repeatedly allege that
Mr. Croft decided to buy the Policy precisely because it allowed him to "*choose the amount* and
frequency of [the] premium payments."  FAC ¶¶ 9, 47, 96, 100 (emphasis added).  Only Plaintiffs – *not*
AXA – had the ability to "change" the planned periodic premium amount.  The reason Plaintiffs' planned
premium amount "never changed" (*id.* ¶ 107) is that Plaintiffs chose to pay only "the bare minimum
required [based on the initial COI rate] to keep the [P]olicy in force" (*id.* ¶¶ 46, 92), and Plaintiffs'
scheduled $28,911.33 monthly premium outlay was sufficient until AXA implemented the COI
Adjustment in March 2016.  But the Policy warned of "CHANGES IN THE MONTHLY DEDUCTIONS
FROM THE POLICY ACCOUNT" and that "THE PLANNED PERIODIC PREMIUMS [OF $346,936
PAYABLE ANNUALLY] MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE
INSURANCE COVERAGE IN FORCE."  Rappaport Decl. Ex. A (Policy) at 4.

[13] Plaintiffs allege that "AXA's marketing documents" (presumably referring to all referenced documents)
"constitute 'advertising' as that word is used in the Arizona Consumer Fraud Act."  FAC ¶ 91.  The

Regardless, there is nothing misleading in the Annual Reports.  Plaintiffs allege that the "projections [allegedly shown] were misleading because the stated [Policy] values were not based on actual values,"[14] (FAC ¶¶ 102-03), whatever "actual values" may mean.  The Annual Reports expressly disclosed that if COI rates increased to the contractually permitted maximum and if Plaintiffs continued to pay their previously chosen premium amount, both the Policy's Death Benefit and Policy Account Value would be $0.  Rappaport Decl. Ex. D at 5.  Indeed, just below the table of "Projected Values," the Annual Reports disclose that "[t]his policy *may be in danger of terminating without value* in the next 12 months unless additional premium is paid." *Id.* (emphasis added).  Mr. Croft's signed acknowledgment of the Sales Illustration disclosure and similar disclosures in other allegedly misleading referenced documents preclude a fraud claim.  *See Van Den Heuvel v. AI Credit Corp.*, 951 F. Supp. 2d 1064, 1082 (E.D. Wis. 2013) (insured's fraud claim based on allegations that the illustrations "should have disclosed the impact of investment yield shortfalls or included different interest crediting rates" was "barred

---

Annual Reports do not qualify.  The ACFA defines "advertisement" as "the attempt by publication, dissemination, solicitation or circulation, oral or written, *to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise*."  *Maricopa Cty. v. Office Depot Inc.*, 2014 WL 12672679, at *1 (D. Ariz. Dec. 15, 2014) (emphasis added) (citing A.R.S. § 44-1521(1)).  "Sale" is defined in the ACFA to "mean[] any sale, offer for sale, or attempt to sell any merchandise for any consideration[.]"  *Davis v. Bank of Am. Corp.*, 2012 WL 3637903, at *4 (D. Ariz. Aug. 23, 2012) (quoting A.R.S. § 44-1521(7)).  The alleged deception must occur before – not after – the consumer purchases the merchandise in question.  *Rich v. BAC Home Loans Servicing LP*, 2014 WL 7671615, at *10 (D. Ariz. Oct. 9, 2014) ("allegedly false statements" made in connection with potential *modification* of a loan payment schedule for an *existing* loan – not "an offer for a new loan" – "were not made in connection with the sale or advertisement of merchandise" (emphasis added)); *Beshears*, 2007 WL 1438738, at *2 (statements made *after* policy purchase "could not have been relied upon by [p]laintiff in entering into the policy, a necessary requirement of [consumer] fraud" claim).  The Court should disregard all ACFA allegations (*see* FAC ¶¶ 102-03, 107-08) based on the Annual Reports.

[14] This allegation is demonstrably incorrect.  Even a cursory review of the Annual Reports makes clear that they report information about the Policy Account for the prior year, such as *past* "policy account activity" and account "transactions," actual "policy values" as of the end of each annual reporting period (August 10), and premiums *already paid* for that prior year.  *See* Rappaport Decl. Ex. D at 4-5.  The only "projected values shown" in the Annual Reports were based on maximum "*Guaranteed* Charges," *not* current non-guaranteed COI rates.  *Id.* at 5 (emphasis added).

by the language of the illustrations, which [plaintiff] signed" to acknowledge his understanding that "any non-guaranteed elements illustrated are subject to change and that actual results could be more or less favorable than those shown").[15]

Plaintiffs' remaining fraudulent omission theory posits that AXA's COI rates at the time of Policy issuance (and for *nine* years thereafter) were "based on unreasonably reduced mortality rates[,]" making "a large COI increase . . . necessary" in the future, and that AXA "failed to disclose these facts to Mr. Croft at the time he decided to purchase the policy." *See* FAC ¶¶ 95, 108, 113, 114. But Plaintiffs do not identify any statement rendered misleading by this alleged omission nor any duty on AXA's part to either disclose the mortality assumptions on which the COI rates were based or that the COI rates advertised to Mr. Croft in 2006 were allegedly "steeply discounted" (*id.* ¶ 135). There can be no deception when both the possibility (and even likelihood) of a COI increase and its potential effect on Plaintiffs' Policy Account values were plainly and repeatedly disclosed. *See, e.g.*, Rappaport Decl. Ex. C (Sales Illustration) at 6. In sum, Plaintiffs have not identified any false statement or omission made by AXA "in connection with the sale or advertisement" of the Policy (or thereafter).

### 2.    Plaintiffs Do Not Plausibly Allege AXA's Intent Not to Perform

An unfulfilled contractual promise is actionable in contract, not in tort. *Ahmed v. Collins*,

---

[15] *See also In re American Southwest Mortg. Litig.*, 1990 WL 304214, *4-5 (D. Ariz. July 12, 1990) (dismissing ACFA claims where projections provided to investors were accompanied by cautionary language indicating projections were premised on specified assumptions); *Toulon v. Cont'l Cas. Co.*, 2015 WL 4932255, at *5 (N.D. Ill. Aug. 18, 2015) ("[T]his latter version of plaintiff's consumer fraud claim still remains implausible in light of defendant's multiple disclaimers that premiums might increase."); *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 349-50 (1999) (defendant's "disclaimers" disclosing that "dividend/interest rates are not guaranteed and that they may be higher or lower than depicted" did "not constitute a 'misrepresentation or material omission' necessary to sustain a cause of action for fraud"); *Von Hoffmann v. Prudential Ins. Co. of Am.*, 202 F. Supp. 2d 252, 260 (S.D.N.Y. 2002) (insurance illustrations containing purportedly false projections held non-actionable in light of express disclaimers in the illustrations concerning non-guaranteed elements).

15

23 Ariz. App. 54, 56-57 (1975) ("Promises relating to future events, which are unkept constitute, at most, a breach of contract.").  An ACFA claim cannot be based on an unfulfilled promise unless, at a minimum, "the promise [was] made without a present intent to perform[.]"  *See Correa v. Pecos Valley Dev. Corp.*, 126 Ariz. 601, 605 (Ct. App. 1980).  Even assuming that the COI Adjustment somehow was at odds with AXA's advertising of the Policy as "flexible premium" (it was not), Plaintiffs fail to allege that AXA lacked the intent to perform when it made its promise.

The FAC alleges in conclusory fashion and "upon information and belief" that "AXA knew a large COI increase would be necessary as early as 2006, when Mr. Croft was deciding to purchase the policy" but "never disclosed it," and that its conduct therefore "violated [ACFA]" by "leading Mr. Croft and thereby, the Trust to believe that they were purchasing flexible-premium universal life insurance[.]"  *See* FAC ¶¶ 110, 113, 120.  These allegations lack specificity and plausibility.  They do not demonstrate an awareness in 2006 that alleged representations about "flexible premium" Policy mechanics were or ever would be false – let alone an intent to alter the "flexible premium" features of the Policy a decade later.  As discussed, Plaintiffs fail to identify a contractual promise or other representation rendered false by the nondisclosure of AXA's alleged plan in 2006 to increase COI in 2016.[16]  AXA never promised that COI rates would not increase.  It stated the opposite.  AXA disclosed – clearly and repeatedly – that COI rates were "not likely" to "remain unchanged."  *See, e.g.*, Rappaport Decl. Ex. C at 6.

---

[16] Plaintiffs also do not allege, as required for an omission-based ACFA claim, that AXA *intended* Mr. Croft to rely on the allegedly omitted information about a future COI increase.  *In re Arizona Theranos, Inc., Litig.*, 256 F. Supp. 3d at 1023.  Even if Plaintiffs had included such an allegation, the fact that AXA repeatedly disclosed both the possibility and the potential magnitude of a future COI increase would negate any allegation of intent on AXA's part to deceive Mr. Croft.

Plaintiffs' allegations – if true – would mean that from at least 2006 (if not earlier) until 2016, AXA knowingly undercharged Mr. Croft and the Trust, providing years of life insurance protection at below fair market rates so that – assuming Mr. Croft (84 years old at the time of Policy issuance) did not pass away in the interim – AXA could surprise Plaintiffs with a rate hike a decade later. This "fraud" theory is implausible.[17] Plaintiffs do not come close to alleging "facts that give rise to a strong inference" that AXA acted with the requisite intent. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) ("speculation and conclusory allegations" are insufficient to plead fraudulent intent under Rule 9(b)).

### 3.    Plaintiffs Fail to Plead Actual Reliance

In addition to these flaws, Plaintiffs do not plead that AXA made any statement "in connection with the sale or advertisement" of the Policy to *them* or induced *their* reliance. *See Kuehn*, 208 Ariz. at 129 (plaintiff must show actual reliance on false or misrepresented information to recover under the ACFA). Plaintiffs allege only that AXA marketed AUL II with

---

[17] In their breach of contract claim, Plaintiffs plead that AXA breached the "Changes in Policy Cost Factors" provision because AXA's mortality and investment income assumptions did not *actually* change or could not have changed to the extent they did between the time of Policy issuance in August 2006 and the announcement of the COI Adjustment in October 2015 and therefore were not reasonable. In their ACFA claim, Plaintiffs plead the contrary: that the mortality assumptions supporting the COI Adjustment announced in 2015 *were* reasonable and an increased COI rate *was* justified by the higher mortality risk, but that these revised assumptions had been AXA's *actual* assumptions since at least 2006 when Mr. Croft purchased the Policy (again, no "change" in AXA's actual assumptions allegedly occurred between Policy issuance and the COI Adjustment). Plaintiffs' ACFA claim fails because the facts alleged in support of it are inconsistent with those alleged in support of the contract claim – mortality assumptions supporting the COI Adjustment cannot be both reasonable and unreasonable. *See Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 67 (S.D.N.Y. 2015) (Furman, J.) ("[W]here a plaintiff's 'own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss . . . .'" (internal citation omitted)). Plaintiffs do not and cannot plead their ACFA claim in the alternative under Rule 8(d)(2) because Plaintiffs *incorporate* their express breach claim into their ACFA claim. FAC ¶ 89; *see also Maloney v. Scottsdale Ins. Co.*, 256 F. App'x 29, 31-32 (9th Cir. 2007) (affirming dismissal and observing: "The Federal Rules of Civil Procedure allow parties to plead inconsistent factual allegations in the alternative. . . . The inconsistent allegations in the instant complaint, however, were not pleaded in the alternative; they were expressly incorporated into each cause of action.").

a Fact Card (FAC ¶ 9) and that "AXA created and offered a numeric summary . . . *to Mr. Croft* on August 1, 2006[.]" *Id.* ¶ 105 (emphasis added). The FAC does not allege that either Mr. Croft or a representative of the Trust ever saw the Fact Card, only that AXA has used the Fact Card generally.[18] Nor do Plaintiffs allege that the Trust (as opposed to Mr. Croft) ever received the so-called "numeric summary" – the only other "marketing document" that conceivably could be described as "advertising."[19] FAC ¶¶ 91, 105. Even if *Mr. Croft* relied on the Fact Card or another piece of advertising from AXA, it would not matter because there is no allegation that any representative of the *Trust* did so. Here, the Trust is a *second* owner of the Policy. It did not purchase the Policy from AXA and was not the recipient of any "information and marketing" allegedly provided in connection with the sale of the Policy. *See id.* ¶¶ 2, 33.

Plaintiffs attempt to avoid this problem by alleging that "Mr. Croft, *and thereby, the Trust*, relied on" the alleged misrepresentations and omissions. *Id.* ¶¶ 117-18, 120 (emphasis added); *see also id.* ¶¶ 100, 116, 146 (referring to beliefs allegedly held by "Mr. Croft *and thereby the Trust*"). But Mr. Croft's alleged reliance (and beliefs) cannot be imputed to the Trust. The ACFA requires "a direct communication" by the seller to the consumer "related to a sale between the parties." *Sullivan v. Pulte Home Corp.,* 231 Ariz. 53, 60-61 (Ct. App. 2012)

---

[18] The FAC seeks to create the impression that Mr. Croft saw the Fact Card. *See, e.g.*, FAC ¶ 2 (Mr. Croft "received information and marketing of the [P]olicy"). This is exactly the kind of vagueness and ambiguity that Rule 9(b) prohibits. Plaintiffs are required – but fail – to specify when, where, and from whom they received the Fact Card (or other document containing the alleged misrepresentations and omissions). *E.g.*, *Beshears*, 2007 WL 1438738, at *2 (dismissing ACFA claim against an insurer on Rule 9(b) grounds where plaintiff "d[id] not allege which employee or type of employee made fraudulent statements to Plaintiff before he purchased his policy").

[19] Plaintiffs' allegations of reliance based on the Annual Reports received *after* issuance of the Policy are also unavailing. *See Kuehn*, 208 Ariz. at 130 (consumers could not establish reliance where they received the allegedly false appraisal report "only after they were already contractually bound to purchase the real estate"). These Annual Reports are neither "advertisement[s]" nor "sale" materials within the meaning of ACFA. *See supra* note 13.

(vacated in part on other grounds) (declining to "extend[] the private cause of action under the [A]CFA to subsequent purchasers" where "[t]here was no 'sale' or transaction between [defendant] and [plaintiffs]," reasoning that "[b]ecause a subsequent purchaser is not a party to the original transaction . . . , such a purchaser is not within the class of consumers intended to be protected by the implied private cause of action under the [A]CFA").  The absence of allegations of a false statement or omission made by AXA to Plaintiffs in connection with the sale of the Policy and relied on by them, requires dismissal of the ACFA claim.[20]

## II.   THE FAC FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### A.   The Contractual Implied Covenant Claim Impermissibly Duplicates Plaintiffs' Express Breach Claim

Plaintiffs' implied covenant claim should be dismissed for the same reason the Court dismissed that claim in *EFG* and *Duffy*: it is "duplicative of [plaintiffs] express contract claims." In those cases, Plaintiffs alleged "that AXA violated the implied covenant of good faith and fair dealing by raising and charging excessive COI rates absent sufficient justification, information disclosure, or basis; and in a manner that improperly targeted Plaintiffs, boosted profits, and forced Plaintiffs to choose between paying [unjustifiable] premiums . . . and giving up their policies." *See EFG*, ECF No. 102 (2/14/18 MTD Order) at 3, 5.[21]  The FAC alleges essentially

---

[20] In addition, Plaintiffs' conclusory prayer for punitive damages should be dismissed because they have not alleged the type of aggravated conduct that could support recovery of punitive damages. *Rawlings v. Apodaca*, 151 Ariz. 149, 161-63, 162 n.8 (1986) ("punitive damages are not recoverable in every fraud case, even though fraud is an intentional tort" and "restrict[ing] . . . availability [of punitive damages] to those cases in which defendant's wrongful conduct was guided by evil motives" such as "where defendant intended to injure the plaintiff"); *Hunter Contracting Co. v. Sanner Contracting Co.*, 16 Ariz. App. 239, 245-46 (1972) (striking recovery of punitive damages because "[j]ust a simple showing of actionable fraud . . . is not sufficient" without "extraordinary facts . . . indicating malice and ill will").

[21] In *EFG* and *Duffy*, the parties briefed, and the Court addressed and dismissed, those plaintiffs' contractual implied covenant claims under both Arizona and California law, among others.  *See EFG*, ECF No. 102 (MTD Order) at 3, 4 n.1.  *See also supra* note 6 (either California or Arizona law applies).

the same thing: (i) that "there is no reasonable basis for the exorbitant increase in the 'Cost of Insurance'" (FAC ¶ 141; *see also* ¶¶ 130, 133, 136-37, 139, 141, 151); (ii) that "AXA made a conscious decision to target policies like the [Policy] owned by the Trust" that were minimally funded (*id.* ¶¶ 132-33); (iii) that AXA's decision to raise COI rates was motivated by a desire "to increase its profits" (*id.* ¶¶ 137-38) and to "either force its insureds to pay un-bargained for premium rates or otherwise . . . forc[e] the policy to lapse" (*id.* ¶ 144; *see also* ¶¶ 142, 145, 147-49); and (iv) that AXA abused its "superior bargaining power" (*i.e.*, discretion) when it raised COI rates (*id.* ¶ 143; *see also* ¶¶ 128-29, 131).  Because Plaintiffs' implied covenant claim duplicates their express breach claim, *see id.* ¶ 85 ("AXA breached the policies because AXA's COI rate increase was not based on the permissible factors" and "d[id] not apply equitably to the class of insureds"), it should be dismissed.

**B.      The "Bad Faith" Tort Claim Is Unavailable Here and Is Also Time-Barred**

To the extent Plaintiffs intended to allege an implied covenant claim sounding in tort, *see e.g.*, FAC ¶ 152 (seeking punitive damages for alleged breach of implied covenant), that claim also must be dismissed.  As a threshold matter, the claim is time-barred by Arizona's two-year limitations period.[22]  *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 174, 176 (1996) (insurance bad faith claim governed by a two-year statute of limitations).  Plaintiffs' implied covenant theory is based on AXA's "conscious decision to raise the Trust's annual premium

---

[22] The Arizona statute of limitations applies here.  In cases transferred pursuant to 28 U.S.C. § 1404(a), the transferee court applies the choice of law rules of the transferor jurisdiction. *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 134, 141-42 (2d Cir. 2015). This case was transferred from the District of Arizona.  ECF No. 16.  Under Arizona choice of law rules, "the limitations period of the forum will apply[.]"  *DeLoach v. Alfred*, 192 Ariz. 28, 30 (1998) (citing Restatement (Second) of Conflict of Laws § 142); *accord Jackson v. Chandler*, 204 Ariz. 135, 136-37 (2003); *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1069 (9th Cir. 2002).  The District of Arizona would have applied Arizona's statute of limitations to the "tortious" implied covenant (or "bad faith") claim. *E.g.*, *Seltzer v. Paul Revere Life Ins. Co.*, 2010 WL 11523741, at *3 (D. Ariz. Dec. 10, 2010).

payment[.]" FAC ¶ 132. Plaintiffs' tortious implied covenant claim, if any, accrued when AXA notified Plaintiffs of the COI Adjustment by letter dated October 5, 2015. *Id.* ¶¶ 53, 55; *Prudential*, 182 Ariz. at 588 ("As a general matter, a cause of action accrues, and the statute of limitations commences, when one party is able to sue another."). More than two years passed before Plaintiffs filed this action on October 25, 2017. *See, e.g.*, *Manterola v. Farmers Ins. Exch.*, 200 Ariz. 572, 578 (Ct. App. 2001) (insurance bad faith claim time-barred where plaintiff "clearly knew or should have known of the facts underlying her bad faith claim" over two years prior to initiating suit).

In addition, "there is no cause of action for breach of the [implied] covenant [in tort] . . . when no [insurance] benefits are due." *See EFG*, ECF No. 102 (MTD Order) at 7-8. Here, as in *EFG* and *Duffy*, Plaintiffs' "bad faith" allegations are based solely on the COI Adjustment. No tort claim can be stated on these facts.[23] *See id.* at 8 (plaintiffs' bad faith tort claim "founder[ed]" because "they d[id] not allege that AXA has withheld insurance benefits owed under the policies").[24] Plaintiffs' tortious implied covenant claim should be dismissed.

---

[23] Although the Court addressed the tortious implied covenant claims in *EFG* and *Duffy* under California law, bad faith tort claims in Arizona are similarly limited to an insurer's misconduct in the claims handling context. *See Prieto v. Paul Revere Life Ins. Co.*, 354 F.3d 1005, 1009 (9th Cir. 2004) ("The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" (quoting *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237 (2000))); *Beaudry v. Ins. Co. of the W.*, 203 Ariz. 86, 93 (Ct. App. 2002) (declining to "expand the tort of bad faith" to cover insurer's alleged failure to pay dividend because contract damages "adequate to protect the insureds").

[24] For the same reasons as in *EFG* and *Duffy,* punitive damages are not available in this contract action. *See EFG*, ECF No. 102 at 12-13; *see also Cates Constr., Inc. v. Talbot Partners*, 21 Cal. 4th 28, 61 (1999) ("In the absence of an independent tort, punitive damages may not be awarded for breach of contract 'even where the defendant's conduct in breaching the contract was willful, fraudulent, or malicious.'"). Even Plaintiffs' tortious breach claim (which should be dismissed) does not contain allegations of outrageous conduct sufficient to sustain a prayer for punitive damages. *See Food Pro Int'l, Inc. v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 995 (2008) (punitive damages improper absent showing that insurer's acts were "evil, criminal, recklessly indifferent to the rights of the insured, or with a vexatious intention to injure"); *accord Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 598

III.     **RESCISSION WOULD BE INEQUITABLE, AND PLAINTIFFS WAIVED THEIR RIGHT TO SEEK IT**

Plaintiffs seek "an order rescinding the contract and requir[ing] AXA to return *all the premiums paid* together with interest and attorney's fees."  FAC ¶ 152(D) (emphasis added).  Such relief is not available as a matter of law.  First, "[a] condition of rescission is that the rescinding party must restore the other party to the status quo" before the contract.  *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1109, 1139 (C.D. Cal. 2002); *see also Jennings v. Lee*, 105 Ariz. 167, 170 (1969).  That is impossible here.  The Policy has terminated.  For eleven years, AXA provided $5 million of life insurance protection against the risk of Mr. Croft's death.  That benefit cannot be returned or undone.  Where "the situation has so far changed that rescission can only be effected with injuries to those parties and their rights, rescission will be denied and the complaining party left to other remedies."  *Real Estate Assocs.*, 223 F. Supp. 2d at 1139 (citing *Beckwith v. Sheldon*, 165 Cal. 319, 324 (1913)); *Cestro ex rel. Cestro v. LNV Corp.*, 2011 WL 3292574, at *5-6 (D. Ariz. Aug. 1, 2011) (denying rescission "because the status quo cannot be restored").

Second, and for the same reason, rescission would be inequitable.  *Real Estate Assocs.*, 223 F. Supp. 2d at 1139 ("Rescission is controlled by equitable principles."); *see also Jennings*, 105 Ariz. at 173.  Plaintiffs propose that the Trust get back "all the premiums paid" and AXA receive *nothing* for $5 million of life insurance coverage it provided to Mr. Croft and the Trust for more than a decade.  Rescission is precluded when one party would receive a windfall.  *See, e.g., Gill v. Rich*, 128 Cal. App. 4th 1254, 1264 (2005) ("It is inappropriate to permit [physician] appellants to obtain the benefits of their membership for three years" – including "being able to

_____

(1987) (reversing award of punitive damages where evidence did not establish defendant was "guided by an evil mind").

represent to hospitals [and] clinics" that they had malpractice coverage – "yet avoid membership responsibilities through rescission."); *see also*, *Bollenback v. Cont'l Cas. Co.*, 243 Or. 498, 520 (1966) (Plaintiff rescinding health and accident policy was "not entitled to recover for those premiums paid prior to the year 1959 because . . . he received the protection these payments afforded.  It would be inequitable for him to recover them.").

Third, Plaintiffs waived their right to seek rescission by waiting more than two years after learning of the COI Adjustment to bring this action.  Plaintiffs concede they knew of the alleged facts underlying their rescission claim by October 2015.  FAC ¶ 53.  Thereafter, Plaintiffs did not seek to rescind the Policy but instead continued to enjoy the Policy's coverage for nearly two years (until September 11, 2017).  *See id.* ¶ 39.  A claim for rescission must be brought within a reasonable time, or it is waived.  *Auto. Holdings, L.L.C. v. Phoenix Corners Portfolio, L.L.C.*, 2010 WL 1781007, at *6 (D. Ariz. May 4, 2010) ("A party failing to rescind a contract [within a reasonable time]" – in this case, more than one year – "waives their grounds for rescission[.]"); *Smith v. Hurley*, 121 Ariz. 164, 169 (Ct. App. 1978) (plaintiff who "continued to reap the profits of his contract for two years following his knowledge of the fraud . . . had waived his right to rescind"); *see also, e.g.*, *DuBeck v. Cal. Physicians' Serv.*, 234 Cal. App. 4th 1254, 1264-65 (2015) (health insurance provider asserting rescission more than two years after it had pertinent facts, during which time it profited from premiums that exceeded payments for claims under the policy, waived the remedy).[25]  Two years is unreasonable here as well.  Having unreasonably delayed, Plaintiffs waived any right to seek rescission.

---

[25] *See, e.g.*, *Freedberg v. Ohio Nat'l Ins. Co.*, 975 N.E.2d 1189, 1197-99 (Ill. Ct. App. 2012) (policyholder not entitled to rescission because his "delays [in seeking rescission] and premium payments, *while receiving the benefits of the Policy*, constitute[d] a ratification of the [p]olicy" (emphasis added)).

IV.    THE FAC FAILS TO STATE A CLAIM FOR BREACH OF THE
       "PROCEDURES AND STANDARDS" PROVISION OF THE POLICY

Plaintiffs allege in a conclusory manner (and then, only in the "Factual Background"

section of the FAC) that AXA breached the Policy because the COI Adjustment "was not

executed in accordance with the procedures and standards on file with the relevant California,

New York, or Arizona Department of Insurance procedures."  FAC ¶ 58.  The FAC later quotes

the Policy provision stating that "[a]ny change in policy cost factors will be determined in

accordance with ***procedures and standards on file, if required*** . . . ."  *Id.* ¶ 50 (Plaintiffs'

emphasis).  The FAC contains no other allegations regarding Plaintiffs' "procedures and

standards" theory of breach.  Plaintiffs do not specify *any* applicable "procedure" or "standard,"

nor do they explain anywhere in the FAC, as they must, *how* AXA allegedly violated the relevant

"procedures and standards on file" (if any) by exercising its contractual right to raise COI rates.

Although the Court declined to dismiss *Brach*'s amended breach of contract claim based

on the "procedures and standards on file" clause, *Brach*, ECF No. 63 (12/19/16 MTD Order) at

5-7, the complaints are distinguishable.  Once amended, *Brach* "cite[d] as a specific example [of

'regulations and standards on file'] model laws promulgated by the National Association of

Insurance Commissioners prohibiting unfair discrimination within a class."  *Id.* at 6.[26]  The *Croft*

Plaintiffs offer no such allegations.  Because the FAC is devoid of even basic facts necessary to

support a plausible breach of contract claim based on the "procedures and standards on file"

theory, this theory must be dismissed.  *See Berdeaux v. U.S. Dep't of Educ. Loan Discharge*

*Unit, San Francisco CA*, 2011 WL 3876001, at *8 (D. Ariz. Sept. 2, 2011) (dismissing claim that

defendant failed to comply with "policies, procedures, and applicable due process statutes"

---

[26] AXA disputes that regulations can constitute "procedures and standards on file," but the Court deemed
the allegations sufficient to survive at the pleading stage.

relating to plaintiff's student loan because, among other things, plaintiff "[did] not refer to the specific policies, procedures or processes that allegedly were not properly . . . complied with"); *U.S. ex rel. Smith v. New York Presbyterian Hosp.*, 2007 WL 2142312, at *16 (S.D.N.Y. July 18, 2007) (breach of contract claim "must allege the specific instances or acts that amounted to the breach[;]" failure to allege "how the covenants were breached" results in dismissal).

In *Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579 (1st Cir. 2007), the plaintiffs alleged, without elaboration, that the insurer's COI increases were "not made in accordance with any procedures and standards on file with the [applicable] Insurance Department[s]," as required by the insurance policy. *Id.* at 581-82.  The First Circuit concluded that plaintiffs' failure "to specify what 'procedures and standards' on file with the Division of Insurance [defendant insurer] had allegedly violated" was a "ruinous pleading defect" that warranted dismissal of the breach of contract claim.  Plaintiffs' allegations were based "on sheer speculation, both as to whether any relevant procedures and standards were on file at the Division of Insurance, and more importantly, as to their contents and precisely how [defendant insurer's] COI rate calculations had violated them." *Id.* at 587.  "Plaintiffs . . . must do more than allege, in conclusory fashion, that the defendant breached the contract, by describing . . . the specific contractual promise the defendant failed to keep." *Id.* at 586.  So too here.

## CONCLUSION

For the foregoing reasons, AXA respectfully requests that the Court dismiss with prejudice claims for violation of ACFA, breach of the implied covenant of good faith and fair dealing, the prayer for punitive damages and rescission, and the breach of contract claim to the extent it alleges breach of the "procedures and standards on file" clause of the Policy.

Dated: March 2, 2018                    Respectfully submitted,

                                        MILBANK, TWEED, HADLEY & McCLOY LLP

                                        By:  /s/ *David R. Gelfand*
                                              David R. Gelfand
                                              Stacey J. Rappaport
                                              28 Liberty Street
                                              New York, NY 10005
                                              (212) 530-5000

                                        *Attorneys for Defendant AXA Equitable Life*
                                        *Insurance Company*